IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

COTY RICHARDSON,

          Plaintiff,

    vs.

NORTHWEST CHRISTIAN
UNIVERSITY,

          Defendant.

No. 6:15-cv-01886-AA
OPINION AND ORDER

AIKEN, Judge:

This is the unusual employment discrimination case in which the facts are largely undisputed. Plaintiff Coty Richardson was employed by defendant Northwest Christian University as a professor of exercise science. When she became pregnant, plaintiff informed defendant in order to coordinate her maternity leave. After defendant confirmed plaintiff was unmarried, it offered her three choices: stop living with the father of her child, marry the father of her child, or lose her job. Plaintiff refused the first two options, and defendant fired her. Plaintiff then filed this action, alleging discrimination on the basis of sex, pregnancy, and marital status and asserting related state-law claims for breach

Page 1 - OPINION AND ORDER

of contract and intentional infliction of emotional distress. After discovery, both parties filed motions for summary judgment.

The parties make numerous arguments, but at its heart, this lawsuit is about what happens when an employment policy based on an employer's sincerely held religious belief conflicts with an employee's rights under federal and state discrimination laws. For the reasons set forth below, I enter summary judgment in plaintiff's favor on her claim for marital status discrimination, enter summary judgment in defendant's favor on plaintiff's claim for intentional infliction of emotional distress, and dismiss plaintiff's request for punitive damages. The parties' motions for summary judgment are otherwise denied.

## BACKGROUND

Defendant is a nonprofit, Christian university located in Eugene, Oregon. De Young Decl. Ex. 1 (doc. 37-1). Part of its mission is to evangelize. Womack Dep. 32:8-14 (doc. 38-3). In keeping with its tradition and values, defendant expects its faculty to adhere to "Biblical Christianity," which it defines as living according to "what is instructed [and] taught in the Bible." Womack Dep. 23:1-2. Defendant hires only Christian faculty and expressly requires those faculty to integrate their Christian faith into their jobs, including their instruction to students. Richardson Dep. 107:16-19 (doc. 51-1).

Defendant believes that "[t]he Christian quest for truth relates to all aspects of the liberal arts and sciences, including the humanities, social sciences, and physical and life sciences." Vickers Decl. Ex. I at 10 Oct. 25, 2016 (doc. 38-9). In the words of Dennis Lindsay, Vice President for Academic Affairs, defendant believes it is vital that all subjects be taught by "Christians who are engaged in these disciplines and who bring that to the classroom." Lindsay Dep. 45:3-6 (doc. 38-2).

Page 2 - OPINION AND ORDER

The integration of faith and employment duties "is not something mechanical . . . it's a matter of attitude, a perspective that a . . . professor who is Christian brings to that subject matter and models." Lindsay Dep. 46:2-9. Employees must demonstrate a "maturing Christian faith," which university President Joseph D. Womack further defined as "ongoing exercise in one's faith and growing deeper. Their relationship with the Lord. Deeper in their understanding God's word and the application of such. Active involvement in the community of faith. Service." Womack Dep. 26:14-18.

In 2011, defendant solicited applications for an instructor of exercise science. The position description stated the successful applicant would "provide a solid model of ethical leadership" and "contribute to the integration of faith and learning by addressing this issue in class and in curriculum." Vickers Decl. Ex. A at 10 Oct. 25, 2016 (doc. 38). The description further required applicants to demonstrate "a maturing Christian Faith and be supportive of NCU's mission to develop competent, ethical leaders for service in the workplace, community, Church, and world." *Id.* at 11.

Plaintiff began the application process by submitting a letter of interest, in which she indicated she would be "proud to be employed by a faculty that honors Christian principles and values." *Id.* at 12. At defendant's invitation, plaintiff submitted a personal faith statement as part of her application. *Id.* at 35; Richardson Dep. 89:14-19 (doc. 38-1). She discussed that faith statement in her interview with Dr. Lindsay. Richardson Dep. 92:21-25. In a follow-up letter to Dr. Lindsay, plaintiff expressed excitement about working with faculty "who demonstrate a maturing Christian faith, ethical leadership, [and] a strong moral compass[.]" Vickers Decl. Ex. A at 13 Oct. 25, 2016. At the time plaintiff applied for the position with NCU, she had two children. Although it appears plaintiff never affirmatively disclosed to her supervisors or coworkers that she was not

married, Dr. Lindsay and others assumed (correctly) she was unmarried because she openly discussed her children yet never mentioned a spouse. Lindsay Dep. 66:14-16 (doc. 38-2).

In August 2011, plaintiff began work as an instructor of exercise science. Although she was subject to the faith integration requirements described above, her job duties did not include teaching scripture or praying with students. McNeil Dep. 53:11-13 (doc. 38-4). The parties' employment agreement was governed by a contract running for the academic year. *Id.* at 15. The contract listed certain key duties of employment and stated that

> Other duties and responsibilities as well as faculty rights and privileges are described in the Faculty Handbook and Staff and Faculty Personnel Manual. Employment under this contract may be terminated for cause at any time, as specified in the Faculty Handbook, page 27, in which event all salary and other benefits shall cease as of the effective date of termination.

*Id.* At page 27, the Faculty Handbook states that "[a]dequate cause for termination includes, but is not limited to, professional incompetence, failure to meet performance responsibilities, moral delinquency, or lack of commitment to the mission of the University." Vickers Decl. Ex. H at 11 Oct. 25, 2016. It also set forth procedures for terminating a full-time faculty member:

> If a full-time teaching faculty member's employment is being considered for termination, the Vice President for Academic Affairs and Dean of the Faculty convenes the Faculty Review Panel to review the situation. They then meet with the faculty member. The Vice President for Academic Affairs and the Dean of the Faculty's decision is final. The faculty member is notified in writing regarding the decision taken.

*Id.*

The Staff and Faculty Personnel Manual contains a broad nondiscrimination provision:

> The University's policy is not to discriminate against any employee or applicant for employment because of age (within statutory limits), race, color, sex, national origin or ancestry, marital status, disability, sexual orientation, or any other protected status to the extent prohibited by applicable non-discrimination laws with respect to hiring,

promotion, demotion, transfer, recruitment, termination, salary level or other forms of compensation, or any other term of condition of employment.

Vickers Decl. Ex. I at 11 Oct. 25, 2016. It also contains the following disclaimer:

Northwest Christian University intends this document to be informational and not to be construed as a contract of employment, express or implied, or as a guarantee of the benefits or policies stated herein. NCU may unilaterally add to, modify or withdraw any provision in this manual at any time for any reason. Employees will be notified of any changes in policies or procedures on or before their effective date.

*Id.* at 4.

Defendant has an anti-fraternization policy prohibiting sexual or romantic relationships between faculty and students, but otherwise has no written policy addressing employees' sexual conduct. Lindsay Dep. 94:9-15 (doc. 38-7). Nonetheless, defendant takes the position that its policy requiring faculty to live their lives in conformity with Biblical Christianity necessarily includes a prohibition against "[o]ngoing cohabitation and sexual relations outside of marriage" because those practices are "incompatible with the Christian ethic based on our understanding of the Holy Scripture." Vickers Decl. Ex. E at 2 Oct. 25, 2016. At her deposition, plaintiff asserted she did not consider a prohibition on extramarital sex/cohabitation to be a stated part of defendant's core values. Richardson Dep. 206:4 (doc. 51-1). She conceded, however, that she is unaware of any Christian religions that condone premarital sex. Richardson Dep. 107:20-22.

Plaintiff worked as an instructor for four years. Vickers Decl. Ex. A at 15, 22, 29 & 30 Oct. 25, 2016. During that time, she received uniformly positive performance reviews rating her as "above average" and "doing very well." *Id.* at 16-21 & 23-28. In 2013, the Faculty Review Panel "enthusiastically recommend[ed plaintiff] for a renewed contract as a well-qualified instructor with a sincere commitment to students and peers." Kalish Decl. Ex. A at 14 Nov. 18, 2016 (doc. 44). In

2015, she was promoted to assistant professor. *Id.* at 8. Also in 2015, plaintiff signed a new contract for the 2015-2016 academic year. Vickers Decl. Ex. C at 9 Oct. 25, 2016.

On May 21, 2015, plaintiff emailed Dr. Lindsay and another science professor, Heike McNeil, to inform them that she was pregnant with her third child. Vickers Decl. Ex. A at 31 Oct. 25, 2016. The following day, Dr. Lindsay sent a short email congratulating plaintiff. *Id.* at 32. Dr. Lindsay then privately discussed with Dr. McNeil his assumption that plaintiff was not married and asked Dr. McNeil to "check in" regarding plaintiff's marital status. Kalish Decl. Ex. D at 5 Oct. 25, 2016 (doc. 34). Dr. McNeil set up a meeting with plaintiff over tea. At the end of the meeting, Dr. McNeil confirmed that plaintiff was not married but was living with the baby's father. She told plaintiff that "could be an issue" and to anticipate an "awkward" conversation with Dr. Lindsay in the future. Richardson Dep. 171:13-172:9, 172:21-23 (doc. 38-1). Dr. McNeil then reported back to Dr. Lindsay that plaintiff was not married. Lindsay Dep. 90:11-16 (doc. 34-7).

On June 24, 2015, Dr. Lindsay and plaintiff met to discuss the situation. Dr. Lindsay informed plaintiff that defendant could not support her continued cohabitation outside of marriage. Vickers Decl. Ex. B at 8 Oct. 25, 2016. He presented plaintiff with three choices: marry the baby's father before the start of the academic year in August, admit that she had made a "mistake" and stop living with the baby's father, or lose her job. Richardson Dep. 187:5-12 (doc. 51-1). In his deposition, Dr. Lindsay stated that he understood there could be valid reasons plaintiff would not want to marry the baby's father — for example, if the situation involved domestic abuse. Lindsay Dep. 77:9-78:7 (doc. 46-2). Dr. Lindsay did not expect plaintiff to completely dissociate from the baby's father if they did not get married, as he assumed the father would have some role in the child's life. Lindsay Dep. 78:15. However, the cohabitation had to end; it would have been

unacceptable for them to continue living together even if plaintiff promised to keep the relationship

nonsexual. Lindsay Dep. 81:14.

Dr. Lindsay followed up by phone on June 29, 2015 and June 30, 2015, leaving a voicemail

requesting a call back each time. Vickers Decl. Ex. C Dec. 13, 2016 (doc. 51). Plaintiff responded

in a June 30, 2015 email, which stated:

> After deliberate and careful thought, I would like to preserve my privacy and decline
> speaking about my personal situation to my direct supervisors, co-workers,
> colleagues, or past and present students at this time. . . . I feel that discussion of my
> personal life at my place of work involving matters of marriage, the health of my
> sexuality, my reproduction, and personal choices are not only inappropriate but also
> uncomfortable regardless of the institution in which I work.

Kalish Decl. Ex. A at 5 Oct. 25, 2016.

Dr. Lindsay responded the same day with a letter:

> Conditions of your employment require compliance with the Faculty Handbook. The
> Faculty Handbook is clear that NCU is an academic institution with its foundation
> in the Christian Faith. NCU's goals include that of an institution of integrity, mindful
> of its heritage and Christian service.

> Your pregnancy outside of marriage and cohabitation with the father is incompatible
> with NCU's mission and goals. NCU expects its faculty to be role models for the
> students. Your present circumstance does not reflect faith based conduct consistent
> with NCU goals or expectations.

> In order to continue your employment, you must conform your lifestyle to reflect the
> faith based perspective of NCU. If you choose to continue to cohabitate outside of
> marriage, your employment with NCU must end.

Vickers Decl. Ex. A at 34 Oct. 25, 2016.

In a second letter, sent July 6, 2015, Dr. Lindsay expanded:

> Since your marital status is generally known and your pregnancy will be obvious to
> all, it will be apparent to faculty and students you have engaged in a lifestyle that
> does not reflect faith based conduct consistent with NCU goals or expectations.

Kalish Decl. Ex. A Nov. 18, 2016. In the July 6 letter, Dr. Lindsay gave plaintiff seven days to inform defendant of her decision.

On July 14, 2015, plaintiff responded in a letter. *Id.* at 8. She maintained her stance about privacy regarding personal matters such as her marital status and sexual activity. She also questioned the root of defendant's concerns, noting that she had never been questioned about extramarital sex or cohabitation until she announced her pregnancy.

On July 22, 2015, Dr. Lindsay sent plaintiff a letter terminating her employment. He wrote:

> Our focus is maintaining an institution which reflects its core values based upon the Christian faith. Those core values do not allow for the lifestyle which you have chosen and, based upon your letter, intend to continue. I have tried to be clear with you that sexual relations outside of marriage is contrary to the University's core values. Despite your statements, it is known within the University, both to faculty and to students, that you are a single mother and your pregnancy would result in a very demonstrative violation of that core value. I understand your desire to keep your private life private. However, your actions have resulted in that not being possible.

Vickers Decl. Ex. B at 9 Oct. 25, 2016. The termination letter offered plaintiff a severance package — a payment equivalent to five months' salary and ninety percent of her health insurance premiums over the same time period. De Young Dep. 73:9-10 (doc. 44-7). Receipt of the severance package was contingent on her signing a separation agreement that included a release of all legal claims related to her termination. The termination letter stated that, "regardless of your decision to sign the Separation Agreement please understand that your employment with NCU is now at an end." Vickers Decl. Ex. B at 9 Oct. 25, 2016. Plaintiff alleges that before she received that letter, she attempted to log into her email account and was informed by an IT staff member that she had been fired. Richardson Dep. 200:13-16 (doc. 38-1). At no time during her termination process did defendant convene the Faculty Review Panel according to the procedure outlined in the Faculty

Handbook. De Young Dep. 80:3-5 (doc. 44-7).

As a general matter, defendant takes no affirmative steps to find out whether its employees are having sex or cohabiting outside of marriage. De Young Dep. 56:16-17 (doc. 51-2); Womack Dep. 217:11-12 (doc. 38-2); Kalish Decl. Ex. B at 4 Oct. 25, 2016. Defendant has enforced its extramarital sex/cohabitation policy on three other occasions. In one instance, a male faculty member admitted to another faculty member that he had moved in with his fiancée. Lindsay Dep. 115:8-116:4 (doc. 38-2). After he was told he they had to separate until they were married, the faculty member spent a few nights on a colleague's couch and then the couple obtained a marriage license. In the second instance, a female staff member disclosed she was living with a man to whom she was not married. Lindsay Dep. 119:11-120:10. After she was told she could not continue cohabiting, she got married within days. In the third instance, a male faculty member was fired for having an extramarital sexual relationship with a student. Womack Dep. 216:9-19 (doc. 38-2). It is not clear how defendant learned about the relationship in the third instance, and in any event, plaintiff disputes the relevance of that example because the faculty member was also in violation of the school's fraternization policy.

In August 2015, plaintiff filed a discrimination lawsuit in state court and a complaint with the Equal Employment Opportunity Commission. Vickers Decl. Ex. F Oct. 25, 2016. Defendant then removed the lawsuit to this Court. Doc. 1.

## STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

Plaintiff initially asserted twelve claims for relief. She has stipulated to dismissal of five of those claims.[1] With respect to the remaining seven claims, plaintiff moved for summary judgment on five claims: the federal and state claims for pregnancy and sex discrimination and the state claim for marital status discrimination. Defendant moved for summary judgment on all seven claims: the five listed above, plus plaintiff's claims of intentional infliction of emotional distress and breach of contract. Defendant also asked this court to dismiss plaintiff's request for punitive damages.

I begin by explaining why the First Amendment does not require dismissal of this action. I then turn to plaintiff's claims of discrimination, breach of contract, and intentional infliction of emotional distress. Finally, I address plaintiff's request for punitive damages.

I.    *First Amendment*

Defendant argues that all of plaintiff's claims are barred by the First Amendment. Defendant's primary contention is that the ministerial exception requires dismissal of this action.

---

[1] Plaintiff voluntarily dismissed her state and federal claims of religious discrimination (fourth and twelfth claims for relief, respectively), her claim for wrongful termination in violation of public policy (fifth claim for relief), her claim for violation of Oregon's wage laws (eighth claim for relief), and her claim that defendant violated her right to specific treatment in specific situations (ninth claim for relief). *See* Doc. 42. With respect to those claims, defendant's motion for summary judgment is denied as moot.

Defendant also argues that this Court should decline to adjudicate plaintiff's claims under the doctrine of ecclesiastical abstention. I address each argument in turn.

A.    *Ministerial Exception*

In *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012), the Supreme Court formally recognized "the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of [employment discrimination statutes] to claims concerning the employment relationship between a religious institution and its ministers." The First Amendment mandates such an exception because otherwise, courts would be called on to "interfere[] with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Id.* Importantly, a decision that the ministerial exception applies bars *all* employment discrimination claims related to hiring and firing, not just those closely related to an institution's religious beliefs. "The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful . . . is the church's alone." *Id.* at 194-95. The ministerial exception "operates as an affirmative defense," which means that the employer has the burden of showing the exception applies.[2] *Id.* at 195 n.4.

---

[2] The *Hosanna-Tabor* Court confirmed the existence of the ministerial exception as an affirmative defense to employment discrimination claims, but expressed "no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." *Id.* at 196. The Ninth Circuit has held that the ministerial exception extends "to any state law cause of action that would . . . impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999). For the purposes of this opinion, I assume without deciding that if the ministerial exception applied, it would bar all of plaintiff's claims.

In *Hosanna-Tabor*, the Court declined "to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190. Instead, the Court closely examined the factual record to determine whether the exception applied — an inquiry that entailed balancing society's interest "in the enforcement of employment discrimination statutes" against "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 196. The Court considered four factors important to its inquiry: an employee's formal title, the "substance reflected in that title," the employee's "own use of that title," and whether the employee performed "important religious functions" as part of her job. *Id.* at 192. In *Hosanna-Tabor*, the Court found each factor cut in favor of application of the exception. The plaintiff, a teacher at a Christian school, held the title "Minister of Religion, Commissioned." *Id.* at 191. She had undergone "a significant degree of religious training followed by a formal process of commissioning." *Id.* She "held herself out as minister of the Church" by "accepting the formal call to religious service" and claiming a special ministry-related housing exemption on her taxes. *Id.* at 191-92. Finally, her job duties, which included teaching religion four days a week, leading prayers three times a day, taking her students to chapel service, and occasionally leading that service, added up to "an important role in transmitting the Lutheran faith to the next generation." *Id.* at 192. The Court held the ministerial exception applied and dismissed the plaintiff's disability discrimination claim.

Since *Hosanna-Tabor*, the Ninth Circuit has addressed the scope of the ministerial exception in only one published opinion. In *Puri v. Khalsa*, 844 F.3d 1152, 1159 (9th Cir. 2017), the court eschewed a "bright line rule defining the scope of the exception." The court noted that "[c]ertain language in *Hosanna-Tabor* . . . suggests a fairly broad application of the exception," citing the Court's statement that "the exception extends to 'the Church's choice of its hierarchy' when that

Page 12 - OPINION AND ORDER

choice implicates 'a religious group's right to shape its own faith and mission.'" *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 190). Nonetheless, rather than "categorically define the scope of the ministerial exception," the *Puri* court applied the facts in the case to the four factors set out in *Hosanna-Tabor*. *Id.* In *Puri*, the question was whether the ministerial exception applied to positions on the governing boards of "organizations associated with the Sikh Dharma religious community." *Id.* at 1157. The court noted that "some circumstances weigh[ed] in favor of considering the board positions ministerial," including that the mission and purpose of the organizations was to advance and promote the teachings of the Sikh Dharma's religious leader and that board members were required to be ordained ministers who met other religious criteria. *Id.* at 1160. Nonetheless, the court held the ministerial exception did not apply. It relied heavily on the absence of any allegation that board members had "ecclesiastical duties or privileges," the fact that the organizations were not themselves churches, and that the board members' titles ("manager" and "trustee") were secular. *Id.* at 1160-61.

The out-of-circuit cases cited by the parties are of limited use in determining whether the ministerial exception applies here. It is difficult to distill broadly applicable rules from those cases, which involved distinct fact patterns. *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835 (6th Cir. 2015) (applying the ministerial exception to claims of an employee with the title "spiritual director" whose duties included "leading others toward Christian maturity" and cultivating "intimacy with God and growth in Christ-like character through personal and corporate spiritual disciplines"); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 179 (5th Cir. 2012) (holding that the ministerial exception barred claims of a church "music director" despite the absence of any formal training in Catholic doctrine because of "the important part his ostensibly secular duties" in

Page 13 - OPINION AND ORDER

coordinating all the musical aspects of services "played in furthering the mission and message of the church at Mass"); *Ciurleo v. St. Regis Parish*, — F. Supp. 3d —, 2016 WL 5870049, \*5 (E.D. Mich. Oct. 7, 2016) (concluding that the ministerial exception barred claims even though only the last of the four *Hosanna-Tabor* factors applied because duties of giving daily religious instruction and leading morning prayers "are the hallmark of religious exercises through which religious communities transmit their received wisdom and heritage to the next generation of believers"); *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (declining to apply the ministerial exception to a "lay teacher" at a Catholic school who had no special religious training and never held herself out as a minister even though her job duties included attending and participating in prayer and religious services with students); *Dias v. Archdiocese of Cincinnati*, 2013 WL 360355, \*4 (S.D. Ohio Jan. 30, 2013) (concluding that a non-Catholic teacher at a Catholic school was not a minister because she "was not permitted to teach Catholic doctrine"); *see generally* Jessica L. Waters, *Testing Hosanna-Tabor: The Implications for Pregnancy Discrimination Claims and Employees' Reproductive Rights*, 9 Stan. J. C.R. & C.L. 47, 67 (2013) (noting a split among judges regarding how much to defer to an employer's characterization of an employee's position as ministerial, and predicting that "*Hosanna-Tabor*'s limited guidance may be of little use to lower courts attempting to define the contours of the exception in specific cases"). The one unifying theme is that courts must carefully apply the *Hosanna-Tabor* factors to the specific facts of each case.

Based on the undisputed facts in the summary judgment record, I conclude the ministerial exception does not apply in this case. First, plaintiff's title, assistant professor of exercise science, was secular. Second, plaintiff did not undergo any specialized religious training before assuming her position. Third, although there is ample evidence plaintiff held herself out as a *Christian*, there

Page 14 - OPINION AND ORDER

is no evidence she held herself out as a *minister*. With respect to the fourth factor, there is evidence plaintiff performed some important religious functions in her capacity as a professor. She was expected to integrate her Christianity into her teaching and demonstrate a maturing Christian faith. But any religious function was wholly secondary to her secular role: she was not tasked with performing any religious instruction and she was charged with no religious duties such as taking students to chapel or leading them in prayer. If plaintiff was a minister, it is hard to see how any teacher at a religious school would fall outside the exception. Courts have properly rejected such a broad reading of *Hosanna-Tabor*, which would permit the ministerial exception to swallow the rule that religious employers must follow federal and state employment laws. *See, e.g.*, *Dias*, 2013 WL 360355 at *4 (rejecting the argument that any teacher at a religious school who is a "role model" is a minister). The ministerial exception does not bar plaintiff's claims.

B.    *Ecclesiastical Abstention*

Defendant argues that even if the ministerial exception does not apply, the First Amendment bars this Court from weighing in on plaintiff's claims. As the Ninth Circuit explained in *Puri*, the ecclesiastical abstention doctrine, which is rooted in the Establishment and Religion Clauses, precludes courts from interfering "in the internal affairs" of religious organizations to "resolve religious controversies that incidentally affect civil rights." 844 F.3d at 1162. Ecclesiastical abstention applies only if a court would necessarily have to "resolv[e] underlying controversies over religious doctrine" in deciding a case. *Id.* at 1164. If the court can adjudicate the dispute by applying "neutral principles," however, there is no need to abstain. *Id.* at 1168. Here, there is no need to "pass judgment on questions of religious faith or doctrine" in order to resolve plaintiff's claims; the claims can be resolved by applying ordinary principles of employment law. *Id.*

Accordingly, ecclesiastical abstention does not apply.

II.      *Discrimination Claims*

Plaintiff asserts defendant discriminated against her on the basis of sex and pregnancy, in violation of Title VII of the Civil Rights Act, and on the basis of sex, pregnancy, and marital status, in violation of Or. Rev. Stat. § 659A.030(1). I first analyze plaintiff's pregnancy and sex discrimination claims, and then turn to plaintiff's marital status discrimination claim.

A.      *Pregnancy/Sex Discrimination*

Federal and Oregon law prohibit employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a); Or. Rev. Stat. § 659A.030(1). Pregnancy discrimination is a subset of sex discrimination. 42 U.S.C. § 2000e(k); *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 671 (1983). Because Oregon's employment discrimination statute was modeled after Title VII, plaintiff's state and federal discrimination claims are analyzed in the same way. *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011). Here, plaintiff's sex and pregnancy discrimination claims are factually identical; she does not allege that defendant discriminated against her on the basis of sex in any way except by firing her after it learned she was pregnant. For simplicity's sake, therefore, I refer to plaintiff's sex and pregnancy discrimination claims collectively as her pregnancy discrimination claims.

As a threshold matter, I must determine the correct way to frame plaintiff's pregnancy discrimination claims. A plaintiff may prove Title VII discrimination in one of three ways. First, she may point to a facially discriminatory policy — *i.e.*, a policy that expressly differentiates on the basis of some protected classification. *See Frank v. United Airlines*, 216 F.3d 845, 854 (9th Cir. 2000). If the plaintiff establishes that the policy at issue was facially discriminatory, she need not

introduce any additional evidence of discriminatory intent; such a policy is unlawful unless it can be justified as a bona fide occupational qualification. *Id.*

Second, a plaintiff may prevail on a discrimination claim by showing disparate impact. Disparate impact claims challenge "practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (9th Cir. 1985). A plaintiff in a disparate impact case uses statistical evidence to show that a facially neutral policy produces a "significantly discriminatory pattern" based on a protected characteristic. *Sakellar v. Lockheed Missiles & Space Co.*, 765 F.2d 1453, 1456 (9th Cir. 1985).

Finally, a plaintiff may prove discrimination by showing that the employer intentionally discriminated against her on the basis of a protected characteristic. Such discriminatory animus may be supported with two types of proof. The first type, direct evidence, is evidence "which, if believed, proves the fact of discriminatory animus without inference or presumption." *Coghlan v. Seafoods Co. LLC*, 413 F.3d 1090, 1094-95 (9th Cir. 2005). For example, if an employer makes clearly racist or sexist statements, those statements are direct evidence of animus. *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017). Alternatively, a plaintiff may prove discriminatory intent through circumstantial evidence. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). Circumstantial evidence is evidence that, if believed, permits but does not require the factfinder to draw the inference that the employer was motivated by discriminatory animus. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

Based on the evidence in the summary judgment record, plaintiff may proceed only under the second framework. Plaintiff argues that defendant's extramarital sex/cohabitation policy is facially discriminatory because it "treat[s] pregnant unmarried women different from non-pregnant

Page 17 - OPINION AND ORDER

unmarried women." Pl.'s Opp. to Def.'s Mot. Summ. J. 15. This attempt to characterize defendant's policy as facially discriminatory fails because the policy, which applies to all employees, does not *expressly* differentiate on the basis of a protected trait. *Frank*, 216 F.3d at 854. At bottom, this case is about competing inferences regarding defendant's motivation; that type of dispute is a poor fit for the facial discrimination framework.

Plaintiff's disparate impact theory fails for a different reason: the summary judgment record does not contain the necessary statistical evidence to support it. *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1119 (9th Cir. 2008) ("We have previously recognized the necessity of statistical evidence in disparate impact cases."). At oral argument, plaintiff for the first time asserted that defendant's extramarital sex policy has been disproportionately enforced against women, citing a comparison between instances of enforcement, broken down by sex, and the percentages of men and women on defendant's faculty. But the summary judgment record does not contain any information about faculty composition. I decline plaintiff's invitation to take judicial notice of the percentage of men and women on defendant's faculty, as that information is neither "generally known" nor able to be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Plaintiff may proceed with her pregnancy discrimination claims, therefore, only if the summary judgment record contains evidence from which a jury could conclude defendant intended to discriminate against her on the basis of pregnancy. Because plaintiff has pointed to no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to her claims. *Dawson*, 630 F.3d at 935. Under that framework, the plaintiff carries the initial burden to set forth a prima facie case of discrimination. *Aragon v. Rep. Silver State Disposal Inc.*, 292 F.3d 654, 658

Page 18 - OPINION AND ORDER

(9th Cir. 2002) (en banc). She may do so by showing that (1) she is a member of a protected class; (2) she was qualified for her position and performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) circumstances surrounding the adverse employment action give rise to a reasonable inference of discrimination.[3] *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). Once a plaintiff has set forth a prima facie case, the burden shifts to the employer to articulate legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Quaker Oats*, 232 F.3d 1271, 1281 (9th Cir. 2000). The burden then shifts back to the plaintiff to

---

[3] The parties disagree on the formulation of this fourth prong of the *McDonnell Douglas* prima facie case. Defendant contends plaintiff must show she was treated differently from similarly situated employees outside her protected class — *i.e.*, that male employees and/or non-pregnant female employees were treated more favorably than she with respect to the extramarital sex policy. Plaintiff disagrees, arguing that identifying similarly situated employees is but one possible way of demonstrating a causal relationship between the adverse employment action and her pregnancy.

Plaintiff has the better argument. It is true that the Ninth Circuit sometimes has stated that an employee asserting a discrimination claim must show similarly situated individuals outside the protected class were treated more favorably. *E.g. Aragon*, 292 F.3d at 658; *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009). But in other cases, the court has made clear that a plaintiff may show discriminatory intent by showing "that similarly situated individuals outside [her] protected class were treated more favorably, *or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.*" *Hawn*, 615 F.3d at 1156 (emphasis added). It is not surprising that courts sometimes shorthand the fourth factor and refer only to the treatment of similarly situated employees, as that is the "evidence most often used to establish" an employer's discriminatory intent. *See Rohloff v. Metz Baking Co., L.L.C.*, 491 F. Supp. 2d 840, 854 (N.D. Iowa 2007) ("[E]vidence of disparate treatment is not the exclusive means by which a plaintiff may establish an inference of discrimination" (emphasis omitted)). But there is no requirement that plaintiff identify similarly situated employees who were treated differently; she is free to meet her burden by producing any evidence sufficient to permit the inference that "the nature of the employer's policy and the way in which it burdens pregnant women shows that the employer has engaged in intentional discrimination." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1344 (2015); *see also Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169 (7th Cir. 1998) (rejecting mechanistic adherence to the *McDonnell Douglas* formula because it is "essentially a heuristic device, not a rule of law".)

show that the employer's reasons are pretextual, for example by showing the policy is enforced in a discriminatory manner. *Id.*

It is undisputed that plaintiff meets the first three prongs of the *McDonnell Douglas* test. I conclude that she has carried her burden regarding the fourth prong as well. Defendant enforces its extramarital sex/cohabitation policy under two circumstances: (1) when it learns through rumor or self-reporting that an employee is having extramarital sex/cohabiting and (2) when it learns through rumor, self-reporting, or observation of pregnancy that an unmarried employee is pregnant.[4] Defendant's enforcement practices give rise to a plausible inference of discriminatory intent because pregnancy is the basis of one of two enforcement categories and only women can get pregnant.

Because plaintiff has produced prima facie evidence of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for firing her. Defendant identified its extramarital sex/cohabitation policy as the driving force behind plaintiff's termination. As a general rule, private employers may lawfully subject their employees to morality requirements. *See Patton v. J.C. Penney Co., Inc.*, 719 P.2d 854, 857 (Or. 1986) (upholding an employer's termination of its employee for refusing to discontinue a social relationship with a coworker and observing that the plaintiff's arguments about invasion of his right to privacy "blur[red] 'rights' against governmental infringement with 'rights' against a private employer"), *abrogated on other grounds by McGanty v. Staudenraus*, 901 P.2d 841, 852 (Or. 1995). As the Oregon Supreme Court has explained, although "[i]t may seem harsh that an employee can fire an employe[e] because of dislike

_____

[4] Although the record contains no evidence of enforcement based on observation of pregnancy, Dr. Lindsay conceded that if defendant had learned about plaintiff's pregnancy through observation, he would have asked the same questions about extramarital sex/cohabitation. Lindsay Dep. 72:7-15 (doc. 46-2).

of the employe[e]'s personal lifestyle," employers have broad authority to fire "at will." *Id.* That broad authority is, of course, subject to limits — including the discrimination provisions of Title VII and its state-law analogs. But a prohibition on extramarital sex/cohabitation does not automatically constitute pregnancy discrimination under Title VII. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000); *see Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) (holding that the Pregnancy Discrimination Act, which amended Title VII, "does not protect any right to engage in premarital sex").

The burden therefore shifts back to plaintiff to show evidence of pretext. Defendant has introduced evidence that it has enforced its extramarital sex/cohabitation policy against three other employees, none of whom were pregnant. A reasonable juror could conclude from that evidence that defendant is attempting in good faith to prevent all faculty and staff from having sex outside of marriage. But plaintiff has pointed to at least three pieces of evidence from which a juror could infer pretext. First, a juror could infer that defendant's chosen enforcement method will necessarily and obviously lead to disproportionate enforcement against pregnant women. *See Cline*, 206 F.3d at 658 (stating that an employer's purportedly gender-neutral policy against extramarital sex/cohabitation may be discriminatory under Title VII if it is enforced only or primarily against pregnant women). Second, in the correspondence leading up to plaintiff's termination, defendant expressed concern that plaintiff's pregnancy, once visible, would make it obvious to others that she, an unmarried woman, was sexually active. Third, defendant knew plaintiff was unmarried and a mother of two children when it hired her — yet it only inquired about her compliance with the extramarital sex/cohabitation policy when she disclosed her pregnancy. A juror could conclude those pieces of evidence show defendant was less concerned about its employees having sex outside of marriage and more

Page 21 - OPINION AND ORDER

concerned about people *knowing* its employees were having sex outside of marriage — a concern that arguably amounts to animus against pregnant women. Because reasonable jurors could disagree regarding pretext, neither party is entitled to summary judgment on plaintiff's pregnancy discrimination claims.

B. *Marital Status Discrimination*

Unlike Title VII, Oregon law prohibits employment discrimination on this basis of marital status. Or. Rev. Stat. § 659A.030(1). This case presents a question of first impression: whether firing an employee for cohabiting constitutes marital status discrimination under the Oregon statute. As in all cases involving statutory interpretation, the court's task is to "discern the legislature's intent." *State v. Gaines*, 206 P.3d 1042, 1050 (Or. 2009). The first step is to examine the statute's text and context. *Id.* "If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty."[5] *Id.* at 1051.

Plaintiff asserts that she clearly was fired because of her marital status. Defendant presented her with two options that would permit her to keep her job: she could marry her partner or stop living with him. Plaintiff asserts her marital status drove the termination decision, because she was prohibited from doing something (cohabiting with the father of her child) that she would not have

---

[5] Oregon courts may consider legislative history whenever it appears "useful" to their statutory analysis. *Gaines*, 206 P.3d at 1050; *see* Or. Rev. Stat. § 174.020(3) (directing courts to "give the weight to the legislative history that the court considers to be appropriate" when interpreting a statute). However, the reviewing court "may limit its consideration of legislative history to the information that the parties provide to the court." Or. Rev. Stat. § 174.020(3). Neither party relies on legislative history in the sections of the briefs dedicated to marital status discrimination. Accordingly, legislative history does not inform my analysis of the meaning of "marital status."

Page 22 - OPINION AND ORDER

been barred from doing had she been married. Defendant disagrees and contends plaintiff was not

fired because of her marital status, but rather because of her conduct. Defendant points out that it

had no problem continuing to employ plaintiff if she remained single; it simply was unwilling to

continue employing her if she remained single and also lived with her partner.

I conclude the text of the law is ambiguous and fairly susceptible to both parties'

interpretations. To reach that conclusion, I consulted cases from other jurisdictions with similar

marital status protections. *See* Courtney G. Joslin, *Marital Status Discrimination 2.0*, 95 B.U. L.

Rev. 805, 808 (2015) (noting that twenty-one states have laws prohibiting marital status

discrimination in housing, employment, or both). Courts in those states are split regarding whether

rules against extramarital sex or cohabitation is marital status discrimination.[6] The highest state

courts in Alaska, California, and Massachusetts have held that statutes prohibiting discrimination

on the basis of marital status protect unmarried, cohabiting couples. *Swanner v. Anchorage Equal*

*Rights Comm'n*, 874 P.2d 274, 278 (Alaska 1994); *Smith v. Fair Emp't & Hous. Comm'n*, 913 P.2d

909, 918 (Cal. 1996);[7] *Attorney Gen. v. Desilets*, 636 N.E.2d 233, 235 (Mass. 1994). The supreme

courts of North Dakota, Minnesota, Montana, and Wisconsin have reached the opposite conclusion,

---

[6] Some states' statutes make plain that they do not protect unmarried, cohabiting couples. *See, e.g.*, Conn. Gen. Stat. Ann. § 46a-64c(b)(1) (housing law's prohibition on discrimination on the basis of marital status "shall not be construed to prohibit the denial of a dwelling to a man or a woman who are both unrelated by blood and not married to each other"). The split in authority has arisen in states with no such clear exclusion.

[7] *Smith* had no majority opinion. It consists of a plurality opinion and two concurrence/dissents, with the judges disagreeing over whether the California statute impermissibly infringed the defendant employer's religious rights. All three opinions, however, agreed that the statute by its terms protected cohabiting couples. *See Smith*, 913 P.2d at 914-15 (plurality op.); *id.* at 939 (Kennard, J., concurring and dissenting); *id.* at 957 (Baxter, J., concurring and dissenting).

holding that the defendant retained the power to discriminate against an employee or potential tenant

for cohabiting. *N.D. Fair Hous. Council, Inc. v. Peterson*, 625 N.W.2d 551, 562 (N.D. 2001); *State

by Cooper v. French*, 460 N.W.2d 2, 6 (Minn. 1990); *Parker-Bigback v. St. Labre Sch.*, 7 P.2d 361,

364 (Mont. 2000); *Dane v. Norman*, 497 N.W.2d 714, 716 (Wis. 1993). This split in authority

supports the conclusion that the term "marital status" is ambiguous.[8] *Cf. Smiley v. Citibank (S.D.),

N.A.*, 517 U.S. 735, 739 (1996) ("In light of the two dissents from the opinion of the Supreme Court

of California and in light of the opinion of the Supreme Court of New Jersey creating the conflict

that has prompted us to take the case, it would be difficult indeed to contend that the word 'interest'

in the national bank Act is unambiguous[.]")

The law's context does not resolve the ambiguity. The statute neither defines "marital status"

nor addresses the validity of a distinction between conduct and status. In three of the four cases

listed above where the court found discrimination against cohabiting couples was not marital status

discrimination, the court looked to other provisions of state law to give meaning to the term "marital

status." In *Cooper*, 260 N.W.2d at 5, the court cited a criminal statute prohibiting "fornication,"

defined as "[w]hen any man and single woman have sexual intercourse with each other," Minn. Stat.

Ann. § 609.34. The court then noted that it had, in an earlier decision, "unanimously concluded that

the fornication statute was a valid expression of Minnesota public policy." *Cooper*, 260 N.W.2d at

5. The court stated that it was bound to exclude cohabitation from the protection of the marital status

---

[8] A split in authority does not automatically render a statute unambiguous. *See Rosmer v. Pfizer Inc.*, 263 F.3d 110, 118 (4th Cir. 2001). Here, however, numerous courts have issued carefully reasoned opinions — often accompanied by carefully reasoned dissents – reaching different conclusions on the issue. Those different opinions support my conclusion that "marital status" reasonably may be interpreted to reach status only or conduct *and* status.

law because to do otherwise would undermine "the legislature's policy of discouraging the practice of fornication and protecting the institution of marriage." *Id.* at 6. Similarly, in *Dane*, the court cited "the public policy of this state which seeks to promote the stability of marriage and family." 497 N.W.2d at 716. And in *Peterson*, the court found protection of cohabitation irreconcilable with an existing criminal statute prohibiting cohabitation. 625 N.W.2d at 561-62. Oregon has no similar criminal statute or formally expressed public policy to assist in resolving the ambiguity.

In resolving whether banning cohabitation amounts to marital status discrimination, I question the utility and practicality of a bright-line distinction between conduct and status. That distinction has been raised, and rejected, in a number of recent cases addressing discrimination on the basis of sexual orientation. The Supreme Court has explained that "[w]hen homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination[.]" *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (emphasis added); *accord Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of the Law v. Martinez*, 561 U.S. 661, 689 (2010). Just a few weeks ago, the Supreme Court of Washington issued a decision in a case involving a floral shop that refused to provide flowers for the wedding of a gay couple. *State v. Arlene's Flowers, Inc.*, — P.3d —, 2017 WL 629181, *1 (Wash. Feb. 16, 2017). The plaintiff argued that refusal did not violate the state's prohibition against places of public accommodation discriminating on the basis of sexual orientation, attempting to distinguish between discriminating against customers because they are gay and discriminating against customers because they marry someone of their same sex or gender. *Id.* at *5. Citing authority from the United States Supreme Court and a number of other jurisdictions, the court rejected the "proposed distinction between status and conduct fundamentally linked to that status" and held the denial of services was

Page 25 - OPINION AND ORDER

illegal. *Id.* at \*6.

These cases on sexual orientation discrimination do not, standing alone, resolve the question before me today. Sexual orientation is a person's sexual identity in relation to the gender to which they are attracted. As a result, in the sexual orientation discrimination context, conduct (as expressed by who one marries and/or has sex with) and status are a near-perfect fit. In the marital status discrimination context, the relationship between conduct and status is not as clear because single and married people alike have sex outside of marriage and live with people who are not their spouses. Nonetheless, the sexual orientation discrimination cases are illuminating because they underscore that "[c]onduct and status are often inextricably linked." *Veenstra v. Washentaw Country Club*, 645 N.W.2d 643, 650 (Mich. 2002) (Cavanaugh, J., dissenting). Much of what discrimination laws prohibit derives from "assumptions about conduct that stem from, and often are a manifestation of, one's status." *Id.* As Justice O'Connor wrote in her concurrence in *Lawrence*, when "the conduct targeted by a law" is "closely correlated" with a protected status, "the law is targeted at more than conduct; it is instead directed toward" the class of individuals who have the protected status. *Lawrence*, 539 U.S. at 583 (O'Connor, J., concurring). Even though both married and unmarried individuals may have sex outside of marriage, when single people have sex, it is *always* outside of marriage. I conclude that the conduct/status correlation here is close enough that a policy against extramarital sex/cohabitation effectively discriminates on the basis of marital status.

The purpose of Oregon's discrimination law is to remove "arbitrary standards" and to "ensure the human dignity of all people within this state and protect their health, safety, and morals from the consequences of intergroup hostility, tensions, and practices." Or. Rev. Stat. § 659A.003. Oregon's discrimination law is a remedial statute, *Neff v. Jackson Cnty.*, 67 P.3d 977 (2003), and must be

Page 26 - OPINION AND ORDER

broadly construed to "promote the beneficial results intended" — *i.e.*, to protect employees from discrimination, *Newell v. Taylor*, 321 P.2d 294, 297 (Or. 1958). Based on the absence of any evidence suggesting Oregon has a public policy of prohibiting sex outside of marriage, the close correlation between the conduct defendant wishes to prohibit and marital status, the questionable utility of a bright-line distinction between conduct and status in this context, and the canon of statutory construction governing remedial statutes, I conclude Oregon's marital status discrimination law makes it illegal for an employer to impose a policy prohibiting extramarital sex or cohabitation.

Defendant argues that even if such a policy is barred by the Oregon statute, that statute does not apply here for three reasons, all related to defendant's status as a religious organization. First, defendant notes that Oregon law expressly permits religious entities to prefer employees on the basis of shared religion. Or. Rev. Stat. § 659A.006(4). Defendant cites cases in which federal courts, interpreting a provision of federal law the parties agree is identical to the provision of Oregon law at issue here, held that protected preference for a particular religion includes "the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." *See Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (citing *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991), in which a Catholic school fired a teacher who failed to get her marriage annulled before remarrying). The Ninth Circuit, however, has squarely limited the federal exemption to barring claims of *religious* discrimination, holding that while "religious institutions may base relevant hiring decisions upon religious preferences, [they] are not immune from liability . . . for discrimination" on other grounds protected by Title VII. *E.E.O.C. v. Fremont Christian Sch.*, 781 F.2d 1362, 1366 (9th Cir. 1986). Defendant cannot be held liable for hiring only Christians, but there is no accompanying exemption from a claim of marital status

Page 27 - OPINION AND ORDER

discrimination.

Second, defendant contends that holding it liable for marital status discrimination under these circumstances violates its negative associational rights under the First Amendment — specifically, the freedom not to associate with faculty who have sex outside of marriage. The Supreme Court has rejected the argument that application of Title VII to private employers infringes the First Amendment right of association. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (requiring a law firm to consider a female associate's partnership application on the merits and noting that "[t]here is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union.") Religious institutions enjoy special protection under certain clauses of the First Amendment, but their associational rights are no stronger than those of other private entities.

Third, defendant asserts application of the marital status law here runs afoul of Article I, sections 2 and 3 of the Oregon Constitution. Section 2 provides that "[a]ll men shall be secure in their Natural right, to worship Almighty God according to the dictates of their own consciences." Or. Const. Art. I, § 2. Section 3 prohibits laws that "control the free exercise, and enjoyment of relig[i]ous opinions or interfere with the rights of conscience." Or. Const. Art. I, § 3. Defendant concedes the marital status law is "generally applicable and neutral toward religion." *State v. Hickman*, 358 P.3d 987, 995 (Or. 2015). Nonetheless, defendant asks this Court to grant "an individual claim to exemption" based on its sincerely-held religious objection to the law. *Id.*

Defendant has cited no case in which an Oregon court granted such an exemption, and this Court is aware of none. Whatever the Oregon courts mean when they say that the state constitution may sometimes require an individual exemption to a generally applicable law, it cannot be that such

Page 28 - OPINION AND ORDER

an exemption is required any time an individual or entity objects to a state law based on sincerely held religious belief. If exemptions were available any time a state law conflicted with a religious belief, the exception would swallow the rule and religious employers would be broadly immunized from any employment discrimination law that conflicted with their religious beliefs. The only way to avoid that result would be for courts to inquire into how central a given belief is to a particular religion — an inquiry that is unquestionably off-limits. *See New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court what does or does not have religious meaning touches on the very core of the constitutional guarantee against religious establishment."); *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 716 (1981) ("Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.") I decline to break new legal ground and create an individualized exception in this case.

Based on the undisputed facts in the summary judgment record, defendant discriminated against plaintiff because of her marital status, in violation of Oregon law. Plaintiff is therefore entitled to summary judgment on her marital status discrimination claim.

III.    *Intentional Infliction of Emotional Distress*

In order to state a claim for intentional infliction of emotional distress, the plaintiff must show that (1) the defendant "intended to inflict severe mental or emotional distress on the plaintiff"; (2) "the defendant's actions consisted of 'some extraordinary transgression of the bounds of socially tolerable conduct' or exceeded 'any reasonable limit of social toleration'"; and (3) the defendant's conduct "in fact cause[d] the plaintiff to suffer severe emotional distress." *Hetfeld v. Bostwick*, 901

Page 29 - OPINION AND ORDER

P.2d 986, 987 (Or. Ct. App. 1995) (citing *Patton*, 719 P.2d at 857).

Plaintiff contends defendant exceeded all reasonable limits of social toleration by harassing her through letters and phone messages and attempting to use the threat of the loss of her job and health insurance to coerce her to marry or completely dissociate from the father of her unborn child. A jury easily could find that the events surrounding plaintiff's termination were stressful and traumatic for her. But on this summary judgment record, no reasonable juror could conclude that defendant's behavior was so outrageous that it went "beyond the farthest reaches of socially tolerable behavior" to create a jury question on liability. *See Gordon v. Kleinfelder W., Inc.*, 2012 WL 844200, *14 (D. Or. Mar. 12, 2012) (explaining that the question of outrageousness, though fact-specific, is initially a question for the court and may properly be resolved at the summary judgment stage) (citation and quotation marks omitted). Defendant is entitled to summary judgment on plaintiff's claim for intentional infliction of emotional distress.

IV.    *Breach of Contract*

Plaintiff contends defendant breached its employment contract with her by (1) firing her on the basis of pregnancy/sex and marital status; (2) firing her without convening a Faculty Review Panel; and (3) firing her without just cause. Defendant's motion for summary judgment fails as to all three theories.

To convert her discrimination claims into contract claims, plaintiff relies on the contract's incorporation by reference of the Faculty and Staff Personnel Manual's nondiscrimination provision. Defendant contends the nondiscrimination provision is not binding because of the disclaimer that the manual is informational and not to be construed as a contract. I agree that the disclaimer, standing alone, would have that effect. But plaintiff's employment contract *expressly* incorporated

Page 30 - OPINION AND ORDER

the manual's rights and obligations. Accordingly, there is a question of fact whether the manual's nondiscrimination provision was a part plaintiff's employment contract. *See Yartzoff v. Democrat-Herald Publ'g Co., Inc.*, 576 P.2d 356, 359 (Or. 1978) (whether an employee handbook is part of an employment contract is a question of fact resting on the parties' understanding at the time they entered into the contract).

Plaintiff's right to have a Faculty Review Panel convened comes from the Faculty Handbook, which contains no disclaimer like the one of the Faculty and Staff Personnel Manual. Moreover, plaintiff's employment contract not only expressly refers to the Faculty Handbook, it refers to the *specific page* that outlines the termination procedures. Kalish Decl. Ex. A at 3 Nov. 18, 2016. As a result, I find there is no question of material fact that page 27 of the handbook was part of plaintiff's contract. Defendant objects that plaintiff raised the argument about failure to convene a faculty review panel for the first time in the summary judgment briefs. But a plaintiff does not need to spell out every factual basis for her legal claims in the complaint. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.") In addition, plaintiff raised this issue in discovery, putting defendant on notice she might rely on the termination procedures in a motion for summary judgment or at trial. DeYoung Dep. 77:17-80:10 (doc. 51-2). Plaintiff may proceed on this theory. Defendant's argument that no damages flowed from the failure to convene the panel is suited for trial, not summary judgment.

Finally, plaintiff argues she was fired without just cause. Where a "just cause" standard applies to termination, the discharge may be upheld "only if it meets two criteria of reasonableness: one that it is reasonable to discharge employees because of certain conduct, and the other, that the

Page 31 - OPINION AND ORDER

employee had fair notice, express or implied, that such conduct would be ground for discharge."
*Simpson v. W. Graphics Corp.*, 631 P.2d 805, 807 (Or. Ct. App. 1981) (quoting *In re Brooks*, 382
A.2d 204 (Vt. 1977)). There is no question of material fact that plaintiff was fired on at least one
illegal ground (marital status), and illegal grounds for firing are by definition unreasonable. And
there is a question of material fact whether plaintiff was on notice that having extramarital sex was
a fireable offense. Plaintiff's breach of contract claims survive summary judgment, and she may
proceed to trial on all three theories of liability.

V.      *Punitive Damages*

        For federal claims, punitive damages are available only if the defendant acted with "malice
or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §
1981a(b). Punitive damages are generally unavailable in discrimination cases where the legal theory
is "novel." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537 (1999). The state standard is even more
stringent, making punitive damages available only for conduct that goes "beyond mere carelessness
to a willful or reckless disregard of a risk of harm to others of a magnitude evincing a high degree
of social irresponsibility." *Schmidt v. Pine Tree Land Dev.*, 631 P.2d 1373, 1375 (Or. 1981). As
illustrated throughout this opinion, this case is rife with unsettled legal questions and it involves
tension between a religious institution's freedom to require its employees to conform their conduct
to religious norms and individual employee's rights not to be discriminated against. Moreover, for
the same reasons articulated in the section on intentional infliction of emotional distress, no
reasonable juror could find defendant acted with malice or reckless disregard for plaintiff's rights.
Although plaintiff has shown discrimination on the basis of marital status and may be able to prove
discrimination on the basis of pregnancy and breach of contract, nothing in the summary judgment

Page 32 - OPINION AND ORDER

record suggests she could meet either the federal or state punitive damages standards. Plaintiff's

request for punitive damages is therefore dismissed.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN

PART, and Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN

PART, as follows:

> 1. Plaintiff is entitled to summary judgment on her marital status discrimination
> claim (third claim for relief);
>
> 2. Defendant is entitled to summary judgment on plaintiff's claim for intentional
> infliction of emotional distress (seventh claim for relief);
>
> 3. Plaintiff's request for punitive damages is dismissed;
>
> 4. Defendant's motion for summary judgment is denied as moot with respect to the
> claims plaintiff voluntarily dismissed (fourth, fifth, eighth, ninth, and twelfth claims
> for relief); and
>
> 5. The parties' motions for summary judgment are otherwise denied. Plaintiff may
> proceed with her claims for sex/pregnancy discrimination (first, second, tenth and
> eleventh claims for relief) and breach of contract (sixth claim for relief). With
> respect to her sex/pregnancy discrimination claims, plaintiff is limited to a disparate
> treatment/pretext theory.

IT IS SO ORDERED.

Dated this _16th_ day of March, 2017.

_Ann Aiken_
Ann Aiken
United States District Judge